UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

LEONID BURLAKA, et al.

        Plaintiffs,

      v.                                    Case No.  1:17-CV-1126

CONTRACT TRANSPORT SERVICES, LLC,

        Defendant.

**DEFENDANT CONTRACT TRANSPORT SERVICES, LLC'S ("CTS")
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................... 1

A.      CTS's Operations ............................................................................. 1

B.      The Plaintiffs .................................................................................. 5

     1.      Lenoid Burlaka.......................................................................... 5

     2.      Timothy Keuken ....................................................................... 6

     3.      Travis Frischmann ..................................................................... 6

     4.      Roger Robinson ........................................................................ 8

III.    SUMMARY JUDGMENT ARGUMENT........................................................ 11

A.      Summary Judgment Standard ............................................................ 11

B.      Plaintiffs' FLSA Overtime Claims Must Be Dismissed Because They Reasonably
        Expected to Drive in Interstate Commerce and in Fact Did So, Qualifying Them
        for the Motor Carrier Act Exemption ................................................... 12

1.      History of Motor Carrier Act Exemption enactment ............................... 12

2.      Application of the Motor Carrier Act Exemption................................... 13

3.      The reasonable-expectation test precludes Plaintiffs' recovery because Plaintiffs
        were reasonably expected to transport goods in interstate commerce. ............ 14

4.      Plaintiffs also qualify for the Motor Carrier Act Exemption because they regularly
        operated commercial motor vehicles for a motor carrier in interstate commerce. ... 19

a.      Plaintiffs drove commercial motor vehicles for a motor carrier ................... 19

b.      Plaintiffs transported goods in interstate commerce .............................. 19

IV.     CONCLUSION.................................................................................... 22

Case 1:17-cv-01126-WCG   Filed 06/15/18   Page 2 of 29   Document 21

# Table of Authorities

*Antemate v. Estenson Logistics, LLC*,

    2017 WL 5159613 (C.D. Cal. Nov. 7, 2017)............................................................ 17

*Barefoot v. Mid-Am. Dairymen, Inc.*,

    826 F. Supp. 1046 (N.D. Tex. 1993) ...................................................................... 17

*Bishop v. Petro-Chemical Transport, LLC*,

    582 F. Supp. 2d 1290 (E.D. Cal. July 17, 2008)...................................................... 18

*Brennan v. Schwerman Trucking Co. of Virginia*,

    540 F.2d 1200 (4th Cir. 1976) ............................................................................... 16

*Celotex Corp. v. Catrett*,

    477 U.S. 317 (1986).............................................................................................. 11

*Chao v. First Class Coach Co., Inc.*,

    214 F. Supp. 2d 1263 (M.D. Fla. 2001)............................................................ 17, 18

*Darrell Andrews Trucking, Inc. v. FMCSA*,

    296 F.3d 1120 (D.C. Cir. 2002) .............................................................................. 1

*Denius v. Dunlap*,

    330 F.3d 919 (7th Cir. 2003) ................................................................................... 2

*Elliot v. Dave Ernstes & Sons Trucking*,

    2006 WL 2849705 (S.D. Ind. Oct. 3, 2006) .............................................. 15, 16, 18

*Joe D. Hughes, Inc.*,

    23 M.C.C. 563 (June 1, 1940)............................................................................... 13

*Johnson v. Hix Wrecker Service, Inc.*,

   651 F.3d 658 (7th Cir. 2011) ........................................................................................ 12, 20

*Leipolt v. All-Ways Contractors*, Inc.,

   2016 WL 2599125 (E.D. Wis. May, 5, 2016)....................................................... 11, 16, 18, 20

*Levinson v. Spector Motor Serv.*,

   330 U.S. 649 (1947)......................................................................................... 11, 12, 13, 14

*Maren Equip. Leasing v. DHL Express USA*,

   2013 WL 12121304 ....................................................................................................... 2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

   475 U.S. 574 (1986)....................................................................................................... 11

*Morris v. McComb*,

   332 U.S. 422 (1947)............................................................................................. 12, 14, 15

*Owner-Operator Indep. Drivers Ass'n, Inc. v. United States Dep't of Transportation*,

   831 F.3d 961 (8th Cir. 2016) ........................................................................................... 2

*Resch v. Krapf's Coaches, Inc.*,

   785 F.3d 869 (3d Cir. 2015)..................................................................................... 17, 19

*Songer v. Dillon Resources, Inc.*,

   618 F.3d 467 (5th Cir. 2010) ......................................................................................... 17

*Songer v. Dillon Resources, Inc.*,

   636 F. Supp. 2d 516 (N.D. Tex. July 15, 2009)...................................................... 17

*Starrett v. Bruce*,

   391 F.2d 320 (10th Cir. 1968) ...................................................................................... 14

*Vidinliev v. Carey Int'l, Inc.*,

    2009 WL 2848344 (N.D. Ga. Aug. 31, 2009) ................................................................. 15, 18

*Walling v. Jacksonville Paper Co.*,

    317 U.S. 564 (1943) ................................................................................................................ 20

Statutes

29 U.S.C. § 213(b)(1) ................................................................................................................ 1, 13

49 U.S.C. § 13501 ......................................................................................................................... 20

49 U.S.C. § 31502(b)(1) ............................................................................................................... 12

Federal Rules of Civil Procedure

Fed. R. Civ. P. 56(a) ...................................................................................................................... 11

Fed. R. Evid. 201(b)......................................................................................................................... 2

Regulations

46 Fed. Reg. 37902-02 ........................................................................................................... passim

49 C.F.R. § 1.86 ............................................................................................................................. 13

49 C.F.R. § 390.5 ........................................................................................................................... 19

49 C.F.R. § 391.23 ..................................................................................................................... 4, 18

49 C.F.R. § 391.25 ........................................................................................................................... 4

49 C.F.R. § 391.27 ........................................................................................................................... 4

49 C.F.R. § 391.31 ........................................................................................................................... 4

49 C.F.R. § 391.41 ..................................................................................................................... 4, 18

49 C.F.R. § 391.43 ................................................................................................................ 4

49 C.F.R. § 395 ..................................................................................................................... 4

49 C.F.R. § 40 ....................................................................................................................... 4

49 C.F.R. §§ 40, 303, 350-399 ............................................................................................ 2

49 C.F.R. Pt. 390 ................................................................................................................ 13

Wis. Admin. Code DWD § 274.04(4) ............................................................................ 1, 12

Case 1:17-cv-01126-WCG   Filed 06/15/18   Page 6 of 29   Document 21

# I.      INTRODUCTION

This Motion presents a jurisdictional question for the Court: if Plaintiffs are subject to the Federal Motor Carrier Safety Administration's jurisdiction, they are exempt from the Fair Labor Standards Act along with Wisconsin overtime laws. 29 U.S.C. § 213(b)(1) ("Motor Carrier Act Exemption"); Wis. Admin. Code DWD § 274.04(4).[1] The FMCSA's jurisdiction extends to commercial motor vehicle drivers who (1) transport product moving in interstate commerce for a motor carrier, or (2) are part of a class of drivers with a reasonable expectation of doing so. *Secretary of Transportation Notice of Interpretation*, 46 Fed. Reg. 37902-02, 1981 WL 115508 (July 23, 1981). Plaintiffs both transported product moving through interstate commerce for motor-carrier CTS, and had a reasonable expectation of doing so given the interstate nature of CTS's operation. In turn, they were subject to the FMCSA's jurisdiction—and therefore subject to the Motor Carrier Act Exemption—while employed by CTS, and in turn entry of summary judgment in CTS's favor on both the FLSA and Wisconsin overtime claims is required. *Am. Compl.* ¶¶ 38, 42, 44; *Answer to Am. Compl., Affirm. Defenses* ¶ 1.

## II.      STATEMENT OF UNDISPUTED MATERIAL FACTS
### A.      CTS's Operations

CTS is a motor carrier operating under the FMCSA's authority pursuant to a permit issued in FMCSA Docket No. 145402, that transports products for customers in Wisconsin, Minnesota,

---

[1] Section 213(b)(1) states the FLSA overtime requirements "shall not apply with respect to—(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of Section 31502 of title 49"). While the Motor Carrier Act Exemption refers to the Secretary of Transportation's jurisdiction, because the Secretary of Transportation delegated to the FMCSA its responsibility for establishing truck driver qualifications and hours-of-service the FMCSA's jurisdiction is referenced here. *See Darrell Andrews Trucking, Inc. v. FMCSA,* 296 F.3d 1120, 1123 n.1 (D.C. Cir. 2002) (noting "[m]otor carriers were initially regulated by the Interstate Commerce Commission [pursuant to] Motor Carrier Act, Pub. To No. 74-255, 49 Stat. 543 (1935)" and that authority was transferred to the Department of Transportation in 1966, which delegated responsibility for enforcing the Regulations to the FMCSA in 1999).

Iowa, Illinois, and Michigan. (DPFOF[2] No. 1.)[3] To transport its customer's property, CTS employs approximately 171 drivers qualified under the Federal Motor Carrier Safety Regulations ("Safety Regulations") to drive commercial motor vehicles in interstate commerce. (DPFOF No. 101.), *see generally* 49 C.F.R. §§ 40, 303, 350-399.

These drivers can be assigned to a variety of work assignments including (1) regional over-the-road transportation in which a driver typically transport freight on routes of 500 miles or less; or (2) trailer spotting and yard management services, in which a driver typically moves both loaded and empty trailers at customer locations and to facilities around the customer locations to facilitate the movement of the customer freight. (*See* DPFOF No. 7). As qualified commercial motor vehicle drivers, each of these CTS drivers is authorized to operate any of the truck-trailer combinations CTS utilizes to move freight throughout the Midwest, all of which have a gross vehicle weight rating in excess of 10,001 pounds. (DPFOF Nos. 87, 101.)

One of CTS's customers, Green Bay Packaging, Inc., contracts with CTS to facilitate the transportation of its products both in and out of Green Bay Packaging facilities. (DPFOF No. 3.) Plaintiffs were primarily assigned to drive at either the Green Bay Packaging location at 831 Radisson Street, Green Bay, Wisconsin 54302 ("Green Bay Shipping Container") or 2001 American Boulevard, De Pere, Wisconsin 54115 ("De Pere Shipping Container"). (DPFOF No.

---

[2] Defendant's Statement of Proposed Material Facts are cited as "DPFOF No. _"
[3] A true and accurate printout from the FMCSA's database is included as Exhibit 1. This printout is available at https://safer.fmcsa.dot.gov/CompanySnapshot.aspx by searching for MC/MX Number 145402 and clicking the "Licensing & Insurance" link in the upper-right corner. The Court can take judicial notice of CTS's FMCSA registration. *See Brown v. Northwestern University*, 2011WL 6152889, at *1 (N.D. Ill. Dec. 7, 2011) ("The court may take judicial notice of the information on a government website, because it is 'not subject to reasonable dispute' and is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." (citing Fed. R. Evid. 201(b)); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (same); *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. United States Dep't of Transportation*, 831 F.3d 961, 968 n. 2 (8th Cir. 2016) (taking judicial notice of motor carrier data from the FMCSA's website); *Maren Equip. Leasing v. DHL Express USA*, 2013 WL 12121304, at *3 (C.D. Cal. Oct. 22, 2013, aff'd sub nom. *Maren Equip. Leasing, Inc. v. DHL Express USA*, 628 F. App'x 514 (9th Cir. 2016) (taking judicial notice of FMCSA motor carrier registration printout).

4.).[4] At those locations, Plaintiffs were assigned to trailer spotting and yard management services in which they move loaded along with empty trailers around the Green Bay Packaging facility and on public roads to and from one Green Bay Packaging location to another (DPFOF No. 11.) For the loaded trailers, either CTS or another motor carrier's over-the-road driver would proceed to pick up the trailer and bring it to the delivery point, which could be in Wisconsin or outside the state. (DPFOF No. 12, 13.).

From April 19, 2015 to June 8, 2018, CTS transported loaded trailers for over 17,226 customer orders that went through the Green Bay Shipping Container location. (DPFOF No. 5.)[5] Of those, 19.9 percent involved movements across state lines—approximately 93 loads originated outside of Wisconsin, and around 3,343 loads CTS transported began in Wisconsin but were destined for delivery in another state. (DPFOF No. 5.) Over the same period, CTS transported loaded trailers for over 8,882 customer orders that went through the De Pere Shipping Container location. (DPFOF No. 6.) Of those, 26.9 percent involved movements across state lines— approximately 33 loads originated outside of Wisconsin, and around 2,361 loads CTS transported began in Wisconsin but were destined for delivery in another state. (DPFOF No. 6.)

To meet customer demands and consistent with CTS's policy of only employing drivers qualified to operate a commercial motor vehicle, all drivers CTS employs have transported freight on public roadways while employed by CTS and been required to:

1. Maintain a commercial driver's license;

---

[4] For additional background on the Shipping Container operation, Green Bay Packaging has an online video explaining how the Green Bay Shipping Container operation works from the manufacturing process to transportation of the product at http://gbp.com/videos#/9. GREEN BAY PACKAGING, INC., http://gbp.com/videos#/9, (last visited June 14, 2018).
[5] These numbers reflect only those movements that CTS drivers handled from origin to destination and do not reflect loads in which any leg was transported by a motor carrier other than CTS. (DPFOF Nos. 5-6.)

2. Remain part of the random drug and alcohol testing pool mandated by the Safety Regulations (49 C.F.R. § 40)

3. Comply with the driver application and qualification process mandated by the Safety Regulations (including 49 C.F.R. § 391.23 (Qualification of Drivers – Investigation and Inquiries), 49 C.F.R. § 391.25 (Qualification of Drivers – Annual Inquiry and Review of Driving Record), 49 C.F.R. § 391.27 (Qualification of Drivers – Record of Violations), 49 C.F.R. § 391.31 (Qualification of Drivers – Road Test), 49 C.F.R. § 391.41 (Qualification of Drivers – Physical Qualification of Drivers), and 49 C.F.R. § 391.43 (Qualification of Drivers – Medical Examination; Certification of Physical Qualification)); and

4. Comply with other applicable Safety Regulation mandates. (49 C.F.R. § 395) (collectively, the "Driver Requirements"). (DPFOF No. 16.)[6]

Regardless of their driving assignment on a particular day, CTS drivers are subject to assignment as a driver performing any of the services CTS offers its customers. (DPFOF No. 8.). By company policy and in practice, all CTS drivers performing yard spotting work can be indiscriminately called upon at any time to transport goods on public roads, including hauling goods across state lines. (DPFOF No. 14.) In addition, CTS uses a rotating weekend schedule under which any driver assigned weekend duty may be called upon to transport goods as required by Green Bay Packaging. (DPFOF No. 15.)

---

[6] Plaintiffs acknowledge that they were subject to, and complied with, each of these requirements in their deposition testimony and through records produced in the case. (DPFOF Nos. 19-20, 31-33, 47-50, 65-67.)

### B.     The Plaintiffs

#### 1.     Lenoid Burlaka

CTS hired Leonid Burlaka as a driver on February 8, 2016, where he was assigned to provide trailer spotting and yard management services at the Green Bay Shipping Container location. (DPFOF No. 17, 21.). Like the other Plaintiffs, during the entirety of Burlaka's employment he maintained a commercial driver's license (DPFOF No. 20), remained part of CTS's driver drug testing pool mandated by the Safety Regulations, annually certified any violations in the preceding year (as required by Safety Regulations), completed an annual review of driving record (as required by Safety Regulations), and provided a Medical Examiner's Certificate (as required by Safety Regulations). (DPFOF No. 20.)

While employed by CTS, Burlaka testified work on a daily basis could include transporting loaded and empty trailers (i) around the docks at the Green Bay Shipping Container facility, (ii) to warehouses a mile or two from the Green Shipping Container facility; and (iii) to a drop lot across the street from the facility. The warehouses Burlaka transported loaded trailers to were located at 601 Bay Beach Road, Green Bay ("Warehouse 6"); and 1550 North Quincy Street, Green Bay ("Quincy Warehouse"); the drop lot was located across North Webster Court from the Green Bay Shipping Container location. (DPFOF No. 25.).

Burlaka testified that when he moved trailers from the loading docks at Green Bay Shipping Container to the drop lot, the trailers were loaded approximately 75 to 80 percent of the time. (DPFOF No. 26.) He moved loaded trailers from Green Bay Shipping Container to Warehouse 6 approximately five times a shift (DPFOF No. 27.) and moved loaded trailers from Green Bay Shipping Container to Quincy Warehouse approximately five times a shift. (DPFOF No. 28.)

Between February 24, 2016 and August 25, 2017 when his employment ended, Burlaka's transport of loaded trailers to the warehouses involved no fewer than 69 trailers containing goods bound for out-of-state customers of Green Bay Packaging. (DPFOF No. 22.)[7]

### 2. Timothy Keuken

CTS hired Timothy Kueken on December 10, 2007. (DPFOF No. 30.) Keuken was assigned to the same location, but the opposite shift, as Burlaka. (DPFOF No. 36.) Like Burlaka, Keuken's hauled trailers containing goods bound for destinations outside of Wisconsin to Warehouse 6, Quincy Warehouse, and the drop lot across North Webster Court. (DPFOF No. 39.) Between August 24, 2015 and November 14, 2017, Keuken hauled no fewer than 42 trailers containing goods bound for out-of-state customers of Green Bay Packaging. (DPFOF No. 37.)[8]

### 3. Travis Frischmann

Travis Frischmann began his second stint as a CTS driver on November 15, 2010, and left the company October 30, 2017. (DPFOF No. 44, 51.) Initially, Frischmann's assignments involved the transport of freight from Green Bay to Chicago, although he later began receiving assignments to perform trailer spotting and yard management services at the Green Bay Shipping Container location. (DPFOF Nos. 46, 52.).

That switch in assignments did not involve any new application or interview process (DPFOF No. 53.). And while the change reduced the mileage Frischmann drove, it did not eliminate his work transporting freight in loaded trailers—like Burlaka and Keuken, Frischmann

---

[7] Appendix, Table A was compiled based on review of Burlaka's spot sheets, which he personally filled out, bills of ladings, and other shipment related documents in CTS's possession. While Burlaka testified that he would sometimes include movements that he did not personally perform on the spot sheets, he testified that he personally made the majority of movements recorded on each spot sheet. (DPFOF No. 23.)
[8] Appendix, Table B was compiled based on review of Keuken's spot sheets, which he personally filled out, bills of ladings, and other shipment related documents in CTS's possession. While Keuken testified that he would sometimes include movements that he did not personally perform on the spot sheets, he testified that he personally made most of movements recorded on each spot sheet. (DPFOF No. 38.)

hauled trailers containing goods bound for destinations outside of Wisconsin on a frequent basis to Warehouse 6, the Quincy Warehouse, and the drop lot across North Webster Court. (DPFOF No. 57, see also id. at 29, 58-62.) CTS's records indicate those movements involved at least 13 trailers containing goods bound for out-of-state customers of Green Bay Packaging between August 12, 2014 and March 11, 2016. (DPFOF No. 55.)[9]

For reference, below is a Google map image of the Green Bay Shipping Container location and surrounding streets, with the Webster Court drop lot, Warehouse 6, and Quincy Warehouse identified for ease of reference to illustrate the locations Burlaka, Kueken, and Frischmann transported goods between.

---

[9] Appendix, Table C was compiled based on review of Frischmann's spot sheets, which he personally filled out, bills of ladings, and other shipment related documents in CTS's possession. While Frischmann testified that he would sometimes include movements that he did not personally perform on the spot sheets, he testified that he personally made the majority of movements recorded on each spot sheet. (DPFOF No. 56.)



### 4. Roger Robinson

CTS hired Roger Robinson on October 15, 2012. (DPFOF No. 63.) A driver licensed to operate commercial motor vehicles for approximately 40 years, Robinson was initially assigned by CTS provide trailer spotting and yard management services at the Menasha Corporation in Neenah, Wisconsin. (DPFOF NO. 68.) While working for CTS at Menasha Corporation, Robinson hauled loaded trailers between the Menasha Corporation facility and a warehouse across a public

highway. (DPFOF No. 69.) Robinson was then assigned by CTS to provide trailer spotting and yard management services at an RR Donnelley facility on South Broadway Street in Green Bay. (DPFOF No. 71.) While working at RR Donnelly, Robinson moved loaded trailers from the RR Donnelly facility to storage lots in De Pere. (DPFOF No. 72.)

More recently, CTS assigned Robinson yard spotting duties at Green Bay Packaging's De Pere Shipping Container facility. (DPFOF No. 73.) Robinson remains an employee of CTS but is on a medical leave and has been unable to work since September 2017. (DPFOF No. 74.) During his time at De Pere Shipping Container, Robinson hauled loaded trailers from De Pere Shipping Container to a Green Bay Packaging facility referred to as "Folding Carton," which is located at 2275 American Boulevard in De Pere. (DPFOF No. 75, 76.). For reference, below is a Google map image of the De Pere Shipping Container location and surrounding streets, with the De Pere Shipping Container and Folding Carton locations identified for ease of reference to illustrate the locations Robinson transported goods between.



Robinson hauled loaded trailers from De Pere Shipping Container on an as-needed basis, which ranged from once every two or three months to a couple of times per year. (DPFOF No. 77.) Robinson testified that, on any given day, he could be called upon to move a loaded trailer from De Pere Shipping Container to Folding Carton. (DPFOF No. 78.)

In addition to his work in De Pere, CTS called upon Robinson to perform spotting work at Green Bay Shipping Container. (DPFOF No. 79.) His work at Green Bay Shipping Container involved movement of loaded trailers to the Webster Court drop lot. (DPFOF No. 80.) These trips

involved transportation on public roads. (DPFOF No. 81.) Robinson testified that, on any given day, he could have been asked to work out of either De Pere Shipping Container or Green Bay Shipping Container. (DPFOF No. 82.)  Robinson also has been called upon to perform spotting duties at the Green Bay Packaging Mill Division (the "Mill"), which is located at 1601 North Quincy Street in Green Bay. (DPFOF No. 83.) When assigned to the Mill, Robinson hauled loaded trailers from the Mill to a Green Bay Packaging warehouse located at 1100 Bay Beach Road, Green Bay ("Warehouse 3"). (DPFOF No. 84.)

Robinson's yard spotting duties required him to move trailers containing goods bound for destinations outside of Wisconsin on public roads. Robinson made such moves on at least seven occasions. (DPFOF No. 86.)

## III.    SUMMARY JUDGMENT ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). CTS bears the initial burden of informing the Court of the basis of its motion, and identifying portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once CTS meets its burden, the burden shifts to Plaintiffs to establish that a genuine issue as to any material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986).

Whether Plaintiffs are subject to the Motor Carrier Act Exemption turns purely on a question of governmental jurisdiction. *See, e.g., Levinson v. Spector Motor Serv.*, 330 U.S. 649, 661-62 (1947); *Leipolt v. All-Ways Contractors*, Inc., 2016 WL 2599125, at *2 (E.D. Wis. May, 5, 2016). If the

FMCSA has jurisdiction over Plaintiffs' work, then the Motor Carrier Act Exemption applies, and CTS is entitled to summary judgment. Wisconsin's wage and hour laws contain an exemption from the requirement to pay overtime to drivers of a motor carrier that mirrors the Motor Carrier Act Exemption in the FLSA. Wis. Admin. Code DWD § 274.04(4). Plaintiffs' state law overtime claim therefore rises or falls on the on the analysis of the federal exemption.

### B. Plaintiffs' FLSA Overtime Claims Must Be Dismissed Because They Reasonably Expected to Drive in Interstate Commerce and in Fact Did So, Qualifying Them for the Motor Carrier Act Exemption

#### 1. History of Motor Carrier Act Exemption enactment

Whether Plaintiffs are subject to the Motor Carrier Act Exemption is a legal issue that turns purely on a question of governmental jurisdiction. *See*, *e.g.*, *Levinson*, 330 U.S. 649, 661-62; *Johnson v. Hix Wrecker Service, Inc.*, 651 F.3d 658, 661 (7th Cir. 2011) ("a motor carrier employee cannot be subject to the jurisdiction of both the Secretary of Labor and the Secretary of Transportation simultaneously.").

In response to state efforts to regulate motor carrier safety Congress passed the Motor Carrier Act in 1935 authorizing the Interstate Commerce Commission (referred to in this Memorandum as the FMCSA, which inherited the Commission's authority in 1999) to establish qualifications and maximum hours of service for a motor carrier's employees whose work affects safety. *Levinson*, 330 U.S. 649, 657; *see also* 49 U.S.C. § 31502(b)(1). Drivers are among the class of employees whose work is deemed to affect safety and who are accordingly subject to the FMCSA's jurisdiction. *See Levinson*, 330 U.S. at 663; *Morris v. McComb*, 332 U.S. 422 (1947).

Intent on maintaining continuity in the safety programs Congress and the FMCSA developed, the Motor Carrier Act prohibits the overlap of jurisdiction between the United States Department of Labor and the FMCSA. *Levinson*, 330 U.S. at 661-62. Consistent with the

Congressional mandate that the Secretary of Labor's jurisdiction not overlap with the FMCSA, Congress included the Motor Carrier Act Exemption when it passed the FLSA in 1938. Under the exemption, the FLSA's overtime pay requirements do not apply to any "employee with whom the [FMCSA] has power to establish qualifications and maximum hours of service." 29 U.S.C. § 213(b)(1); *see also Levinson*, 330 U.S. at 677, 681 (identifying the goal of Motor Carrier Act Exemption as putting "safety first" by giving "full recognition to the safety program of the "FMCSA").

### 2. Application of the Motor Carrier Act Exemption

The FMCSA's power to regulate hours of service and qualifications extends to drivers who: (1) operate a commercial motor vehicle for a motor carrier in interstate commerce; or (2) who the motor carrier has a reasonable expectation will do so. *See* 49 C.F.R. § 1.86 (giving the FMCSA responsibility for "administering laws and promulgating and enforcing regulations on safety matters relating to motor carrier safety."), 49 C.F.R. Pt. 390 (rules on driver hours of service), 46 Fed. Reg. 37902-02, 1981 WL 115508 ("evidence of driving in interstate commerce *or being subject to being used in interstate commerce* should be accepted as proof that the driver is subject" to FMCSA jurisdiction "for a 4-month period from the date of the proof").

The FMCSA "need only possess the power to regulate the employees at issue; it need not actually exercise that power for the [Motor Carrier Act] exemption to apply" and, according to the FMCSA, this power applies "fully to services performed off the highways as well as upon them." *Joe D. Hughes, Inc.*, 23 M.C.C. 563 (June 1, 1940)[10]; *see also Levinson*, 330 U.S. at 662 ("reports and regulations [of precursor to FMCSA, the ICC] . . . both before and after the enactment of the [FLSA], deal so thoroughly and expertly with the safety of operation of interstate motor

_____

[10] *Joe D. Hughes, Inc.*, 23 M.C.C. 563 is provided as part of Defendants' Appendix of Unpublished Authorities.

transportation as to entitle them to especially significant weight in the interpretation of" the Motor Carrier Act).

It is therefore not necessary that an employee be actively engaged in safety-related activities in order for the employee to fall under the FMCSA's jurisdiction. Rather, while the employee's work "may affect safety of operation during only that part of the time while he is *driving*," the FMCSA's power to establish requirements with respect to his qualifications and activities applies "at all times in order that the safety of operation of his truck may be protected during those particular hours or days when, in the course of his duties," he performs safety-affecting activities. *Levinson,* 330 U.S. 675-76 (emphasis added). Indeed, the *Levinson* court recognized that the alternative—excluding employees for whom driving is only part of their duties from the FMCSA's safety program because they did not drive all of the time—"would have serious consequences." *Id.* at 679; *see also Starrett v. Bruce*, 391 F.2d 320, 323 (10th Cir. 1968) (holding Motor Carrier Action Exemption applicable to qualified commercial motor vehicle driver who had not performed any interstate driving because "it is not the amount of time an employee spends in work affecting safety, rather it is what he may do in the time thus spent, whether it be large or small, that determines the effect on safety.").

### 3. The reasonable-expectation test precludes Plaintiffs' recovery because Plaintiffs were reasonably expected to transport goods in interstate commerce.

The FMCSA's jurisdiction presumptively extends to any driver who "because of company policy and activity . . . could reasonably be expected to do interstate driving." 46 Fed. Reg. 37902-02, 1981 WL 115508; *Morris*, 332 U.S. at 433-34 (carrier's drivers fell within Motor Carrier Act Exemption where "3% to 4% of the carrier's total services" involved interstate commerce, and the carrier indiscriminately assigned drivers to the interstate work).

That a reasonable expectation of a driver operating commercial motor vehicles in interstate commerce is sufficient to give the FMCSA oversight is consistent with the broad jurisdiction given to the FMCSA to regulate motor carrier safety and the reality that safety issues facing a motor carrier are the same regardless of whether there are a few drivers or every driver is sent on an interstate trip. *Morris*, 332 U.S. at 434 (noting that safety concerns of motor carrier exist whether sending every driver on interstate trip or very few); *see also Vidinliev v. Carey Int'l, Inc.*, 2009 WL 2848344, at *3 (N.D. Ga. Aug. 31, 2009) (recognizing conclusion "may seem odd … [b]ut the motor carrier exemption is based on the jurisdiction of the [FMCSA], which is in turn based on safety in interstate transportation."); *Elliot v. Dave Ernstes & Sons Trucking*, 2006 WL 2849705, at *3 (S.D. Ind. Oct. 3, 2006) ('[P]roperly understood the extent of the motor carrier exemption follows not only the negative contours of an exemption, but also the positive contours of a safety program.").

Accordingly, "if jurisdiction is claimed over a driver who has not driven in interstate commerce, evidence must be presented that the carrier has engaged in interstate commerce and that the driver could reasonably have been expected to make one of the carrier's interstate runs. Satisfactory evidence would be statements from drivers and carriers, and any employment agreement." 46 Fed. Reg. 37902-02, 1981 WL 115508. Here, the "satisfactory evidence" necessary to establish the FMCSA's jurisdiction over Plaintiffs, and thus their exempt status, consists of (1) the deposition testimony of Plaintiffs that while employed with CTS they were qualified to drive a commercial motor vehicle in interstate commerce and that, on any given day, they could be called upon to transport interstate goods on public roads; and (2) the undisputed interstate nature of CTS's operation. (DPFOF Nos. 1, 91-95.).

While this evidence standing alone satisfies CTS's evidentiary burden on the reasonable expectations test, courts have also considered additional factors ("Case Law Factors") in the analysis of the reasonable-expectations test that likewise supports CTS's reasonable expectation that Plaintiffs could be called on to perform interstate driving.

- <u>Case Law Factor No. 1: The motor carrier's interstate operating authority and solicitation of interstate business</u>. A motor carrier's interstate operating authority and the interstate nature of its business support the conclusion that a reasonable expectation exists. *See Leipolt*, 2016 WL 2599125, at *4 (identifying "whether the carrier (employer) does any interstate work" as an inquiry to consider in analyzing reasonable expectation test); *Brennan v. Schwerman Trucking Co. of Virginia*, 540 F.2d 1200, 1204 (4th Cir. 1976) (entering judgment in motor carrier's favor on Motor Carrier Act Exemption because, among other things, the motor carrier "at all times relevant hereto held itself out as available for interstate cartage, solicited interstate business, and handled any interstate shipment it received."); *Elliot,* 2006 WL 2849705 at *6 (granting motor carrier's summary judgment motion on Motor Carrier Act Exemption because "Plaintiffs could reasonably be expected to travel interstate as part of their duties" as evidenced by the motor carrier soliciting interstate business and compliance with Safety Regulatins). It is undisputed that CTS has interstate operating authority, markets itself as an interstate motor carrier, actively solicits interstate business, and transports interstate shipments. (DPFOF Nos. 5, 6, 95.)

- <u>Case Law Factor No. 2: The Motor Carrier's efforts to comply with the Safety Regulations</u>. Evidence "that all of Defendants' drivers, including Plaintiffs, are required to comply with [the Safety Regulations] prior to assuming driving duties for Defendants, including maintaining a valid Class A commercial driver's license and meeting the driver qualification requirements of relevant portions of" the Safety Regulations militates in favor of finding the existence of a reasonable expectation that

Plaintiffs were expected to drive in interstate commerce. *Songer v. Dillon Resources, Inc.*, 636 F. Supp. 2d 516, 526 (N.D. Tex. July 15, 2009), *aff'd*, 618 F.3d 467 (5th Cir. 2010); *see also Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 874-75 (3d Cir. 2015) ("evidence of [employer's] efforts to comply with DOT regulations . . . reinforce the drivers' reasonable expectation of driving in interstate commerce."); *Antemate v. Estenson Logistics, LLC*, 2017 WL 5159613, at *9 (C.D. Cal. Nov. 7, 2017) (granting judgment in favor of motor carrier based in part on "[t]he evidence show[ing] that Defendant hired only yard hostlers who held valid CDLs and who otherwise were qualified (including passing physical, medical, and drug tests, as well as background checks) to drive on public roads under the DOT rules."); *Chao v. First Class Coach Co., Inc.*, 214 F. Supp. 2d 1263, 1275 (M.D. Fla. 2001) (Defendant's "efforts to comply with federal requirements for interstate drivers are also significant" indicia of a reasonable expectation of driving in interstate commerce).

Consistent with these cases, requiring Plaintiffs to pass pre-employment FMCSA physicals along with FMCSA driving tests and otherwise complying with the Safety Regulations support the conclusion that the reasonable expectation test is satisfied. (DPFOF No. 96; *see also id*. at 19-20, 31-34, 47-49,66-67.) So too do Plaintiffs' efforts to maintain commercial driver's licenses and medical authorizations and remaining part of the driver drug-testing pool for CTS mandated by the FMCSA during the entirety of their employment.[11] *Songer v. Dillon Resources, Inc.*, 618 F.3d 467, 473 (5th Cir. 2010) ("drivers are engaged in activities of a character affecting safety that subject them to the power of the Secretary . . . if the drivers are required to . . . pass DOT written and driving tests, complete various DOT forms, and pass DOT physical drug tests") (quoting *Barefoot v. Mid-Am. Dairymen, Inc.*, 826 F. Supp. 1046, 1050 (N.D. Tex. 1993), *aff'd*, 16 F.3d 1216, 1994 WL 57686 (5th Cir. Feb. 18, 1994) (per curiam). CTS's issuance of a driver handbook to Plaintiffs notifying them of federal safety requirements

---

[11] (DPFOF Nos. 20, 33-34, 48-49, 67.)

further cements the presence of a reasonable expectation, as does CTS's policy of maintaining Plaintiffs' driver qualification files for presentation in the event of a safety audit. (DPFOF Nos. 97-98.)

- Case Law Factor No. 3: Information conveyed about the job during the hiring process. Courts have also considered what information individuals are given during the hiring process as a relevant factor in the reasonable-expectations test analysis. *Bishop v. Petro-Chemical Transport, LLC*, 582 F. Supp. 2d 1290, 1302 (E.D. Cal. July 17, 2008) (finding that "evidence that during the hiring process, hirees are informed that [the motor carrier] is a 'for hire' carrier and that drivers could be asked to haul loads" out-of-state demonstrates a reasonable expectation of making interstate trips.) During the hiring process, Plaintiffs were asked to satisfy numerous FMSCA requirements including: (1) giving CTS consent as required by Section 391.23 of the Safety Regulations to conduct a background check; (2) Alcohol and Controlled Substance Testing/Training Records in compliance with Section 382.405 (subsections f through h) and Section 382.413 (subsections a through g) of the Safety Regulations; (3) requesting background information from previous employers (49 C.F.R. § 391.23); and (4) obtaining a Medical Examiner's Certificate (49 C.F.R. § 391.41). (DPFOF Nos. 19, 31, 47, 66.)

Plaintiffs also signed a document in which they agreed to follow the terms and procedures of the CTS driver handbook, which discusses interstate driving and the Safety Regulations. (DPFOF Nos. 97, 99.)

- Case Law Factor No. 4: Forced Dispatch. Finally, courts consider the motor carrier's approach to dispatching drivers. *Leipolt*, 2016 WL 2599125, at *4 (noting courts look at whether motor carrier "assigns drivers randomly" to interstate driving); *Vidinlieu,* 2009 WL 2848344, at *3 (considering dispatch approach in reasonable expectation analysis); *see also Chao*, 214 F. Supp. 2d 1275-76; *Elliot*, 2006 WL 2849705 at *6. A policy and practice of forced dispatch indicates a reasonable

expectation of driving in interstate commerce. *Resch,* 785 F.3d at 874 (finding that "retaining discretion to assign drivers to drive either interstate or intrastate routes—at any time" was indicative of the reasonable expectation that one would drive in interstate commerce.) CTS assigned Plaintiffs loads indiscriminately and Plaintiffs knew that delivering these loads was required. (DPFOF No. 14, 15.) CTS has a policy and practice of force dispatch. (DFOF No. 100.)

CTS respectfully requests that the Court adopt the holding in *Morris*, *Songer*, *Resch*, *Leipolt*, *Elliot*, and others of their ilk and grant summary judgment in CTS's favor.

> **4. Plaintiffs also qualify for the Motor Carrier Act Exemption because they regularly operated commercial motor vehicles for a motor carrier in interstate commerce.**

> **a. Plaintiffs drove commercial motor vehicles for a motor carrier**

A commercial motor vehicle is defined as "a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle . . . has a gross vehicle weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more." 49 C.F.R. § 390.5 (defining commercial motor vehicle under the Safety Regulations). Burlaka, Keuken, Frischmann, and Robinson drove truck-trailer combinations that had a gross vehicle weight rating in excess of 10,001 pounds. (DPFOF No. 87.) CTS is a motor carrier authorized by the FMCSA to haul goods in interstate commerce and is subject to the FMCSA's regulatory powers. (DPFOF No. 1.) Plaintiffs therefore drove commercial motor vehicles for a motor carrier.

> **b. Plaintiffs transported goods in interstate commerce**

Each Plaintiff transported goods in interstate commerce. The interstate commerce requirement of the Motor Carrier Act Exemption is satisfied if (1) a driver transports goods across state lines; or (2) transports goods within a single state, but the transportation forms "a practical

continuity of movement" across state lines. *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 569 (1943); 49 U.S.C. § 13501 (granting FMCSA jurisdiction over motor carrier transportation "between a place in either (A) a state and a place in another state [and] (B) a state and another place in the same state through another state"). Moreover, transporting a single interstate movement by a commercial motor vehicle driver creates a presumption that the FMCSA has jurisdiction over the driver's work for four months from the date the driver makes the interstate move. 46 Fed. Reg. 37902-02 ("evidence of driving in interstate commerce *or being subject to being used in interstate commerce* should be accepted as proof that the driver is subject" to FMCSA jurisdiction "for a 4-month period from the date of the proof.") (emphasis added); *Johnson,* 651 F.3d at 661 (same).

Thus, Plaintiffs' transportation of goods entirely within the state of Wisconsin satisfies the interstate commerce requirement because that transportation is one leg of "a practical continuity of movement" in interstate commerce. *Walling,* 317 U.S. at 568. Here, each Plaintiff made exactly the type of moves that satisfy the "practical continuity of movement" requirement to make transportation occurring entirely within a single state interstate commerce. *See Leipolt,* 2016 WL 2599125, at *3 ("All–Ways truck drivers, including the named plaintiffs, transported salt that had been ordered from out-of-state companies. This was simply the final leg of an interstate trip ending in Wisconsin. A "temporary pause" in the transit of goods "does not mean that they are no longer 'in commerce' within the meaning of the Act. As in the case of an agency if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points.") (internal citation to *Walling*, 317 U.S. at 568).

Burlaka transported loaded trailers from Green Bay Shipping Container to Warehouse 6 and Quincy Warehouse approximately ten times a shift. (DPFOF Nos. 27, 28.) In addition, Burlaka frequently moved loaded trailers on public roads from Green Bay Shipping Container to the drop lot nearby. (DPFOF No. 88.) Similarly, Kueken, who worked the shift opposite Burlaka, frequently moved loaded trailers from Green Bay Shipping Container to either the drop lot, Warehouse 6, or Quincy Warehouse. (DPFOF Nos. 40, 42, 89.)

In addition to moving loaded trailers from Quincy Warehouse and Warehouse 6 to Green Bay Shipping Container on a daily basis, Frischmann routinely moved loaded trailers on the same routes as Burlaka and Kueken (i.e., from Shipping Container to the drop lot, Quincy Warehouse, or Warehouse 6). (DPFOF No. 90.)  Between April 19, 2015 and June 8, 2018, 19.9 percent of all customer orders that CTS transported from origin to destination out of the Green Bay Shipping Container location involved interstate movements. (DPFOF No. 5.). De Pere Shipping Container, where Robinson spent most of his time, likewise sent goods for delivery outside Wisconsin at a significant rate. Between April 19, 2015 and June 8, 2018, 26.4 percent of all customer orders that CTS transported from origin to destination out of the Green Bay Shipping Container location involved interstate movements. (DPFOF No. 6.)

CTS has created charts with selected interstate loads that the Plaintiffs hauled for the Court's ease in considering the interstate nature of these movements. *Appendix*, Tables A-D. The loads on Tables A-D alone easily demonstrate that Plaintiffs were subject to the FMCSA's jurisdiction and therefore exempt from overtime under the Motor Carrier Act Exemption for each and every day of their claims.

## IV.    CONCLUSION

The Motor Carrier Act Exemption's application turns on a question of jurisdiction. Here, the FMCSA maintained jurisdiction over each of the Plaintiffs at all relevant times because, as the undisputed evidence demonstrates, Plaintiffs both transported product in interstate commerce and were among a class of employees that CTS could reasonably expect to drive in interstate commerce. See 46 Fed. Reg. 37902-02. Accordingly, the Motor Carrier Act Exemption forecloses Plaintiffs' overtime claims and CTS is entitled to summary judgment.

Dated: June 15, 2018                   _/s/ Andrew J. Butcher_____

Andrew J. Butcher
Scopelitis Garvin Light Hanson & Feary PC
30 W. Monroe Street, Suite 600
Chicago, IL 60603
(312) 255-7172
Fax: 312-422-1224
Email: abutcher@scopelitis.com

James T. Spolyar
Scopelitis Garvin Light Hanson & Feary PC
10 West Market Street, Suite 1400
Indianapolis, IN 46204
(317) 637-1777
Fax: 317-687-2414
Email: jspolyar@scopelitis.com

Andrew R. Brehm
State Bar No. 1091306
330 East Kilbourn Avenue, Suite 827
Milwaukee, WI 53202
(414) 219-8500
Fax: (414) 278-0618
Email: abrehm@scopelitis.com

ATTORNEYS FOR CONTRACT TRANSPORT
SERVICES, LLC

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 15, 2018, upon electronically filing the foregoing document, a copy of same was serviced on all counsel of record via the court's ECF system.

_/s/ Andrew J. Butcher_____
Andrew J. Butcher

4845-8995-1838,